UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,
         Plaintiff,

v.                                                   Case No. 20-CR-196-2

STEPHEN SMITH,

    Defendant.

## GOVERNMENT'S SENTENCING MEMORANDUM

Stephen Smith (the "Defendant") was the co-leader of a scheme to defraud the Paycheck Protection Program ("PPP") and was involved in the submission of five fraudulent loan applications seeking $960,000 to Financial Institution 1. For his conduct, the Defendant faces a guideline sentencing range of 41-51 months' incarceration as recommended by the Plea Agreement (Dkt. 73) and a statutory maximum sentence of 30 years' incarceration. In light of the factors in 18 U.S.C. § 3553 and for the reasons set forth below, the United States respectfully requests that this Court impose a term of imprisonment at the low end of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range and two years of supervised release. The United States also asks that the Court order the Defendant to pay $730,000 in restitution.

I.    **FACTUAL BACKGROUND**

In early 2020, as the COVID-19 pandemic spread across the country causing death and economic distress, the U.S. government assembled relief programs to help

those whose livelihoods were jeopardized. Against this backdrop, the Defendant engaged in a cash grab to fraudulently obtain money through these programs. The Defendant sought to enrich himself by getting involve in multiple fraudulent loan applications, seeking $960,000, using two of his own defunct companies and companies owned by his friends and acquaintances.

### A. The CARES Act

In March 2020, in response to the many challenges presented by the pandemic, Congress passed the CARES ACT, Pub. L. 116-136, which created the PPP. The PPP authorized $349 billion in forgivable loans to small businesses to be used for payroll, mortgage interest, rent/lease payments, or utilities. In April 2020, Congress authorized an additional $310 billion for PPP funding. These funds were designed to address the unprecedented crisis facing Americans—especially business owners whose livelihoods were threatened by the public health emergency. PPP funds were designed as a lifeline.

The program was designed to provide funds quickly and easily to qualifying individuals. PPP loans were not dispensed through any government bureaucracy; funds were distributed by banks who had existing relationships with many of the people in need. To apply, individuals submitted an application to a participating financial institution along with supporting documentation as to the business's payroll expenses. The supporting documentation requirement was minimal, and could be satisfied with one years' worth of the company's tax records. If a PPP loan application was approved, the participating financial institution funded the PPP loan using its own monies, which were 100% guaranteed by the Small Business Administration ("SBA").

### B. Overview of the Scheme

A more detailed recitation of the facts relating to the scheme are detailed in the Defendant's plea agreement (Dkt No. 73), the plea agreements of his co-defendants and co-schemers, the PSR, and the government's submission regarding restitution. (Dkt. No. 87.)

In April 2020, the Defendant learned that his brother, Thomas Smith, had received legitimate PPP loans for two of his businesses, and asked Thomas Smith to help him get a PPP loan for his business, CFA Auto Transport. The Defendant wanted this loan even though CFA was defunct and was not eligible for a PPP loan. Nonetheless, the Defendant and Thomas Smith worked together and created a fraudulent PPP loan application for CFA, which included fake tax forms purporting to show that CFA had 38 employees. The application sought a $242,500 loan. The Defendant dropped off the application at Financial Institution 1 on May 1, 2020, and the loan was funded in full on May 6, 2020. The Defendant then paid Thomas Smith $65,000 of the fraudulent loan proceeds for his assistance in preparing the fraudulent loan paperwork.

After seeing how easy it was to get the money for CFA, the Defendant continued to find other ways to get PPP loans along with his brother. The Defendant was involved to various degrees in the submission the four other fraudulent PPP loans listed below:

3

| Applicant Company | Company Owner | Individuals Involved in Obtaining Loan | Loan Amount (Applied For) | Approx. Date of Loan Application |
|---|---|---|---|---|
| Davis Development Group Inc. | Samuel Davis | Samuel Davis<br>Thomas Smith<br>Stephen Smith | $177,500 | April 26, 2020 |
| Glory Transportation Services LLC | Robert Hamilton | Robert Hamilton<br>Thomas Smith<br>Stephen Smith | $155,000 | May 1, 2020 |
| Rebels Paris LLC | Deon Petty | Deon Petty<br>Thomas Smith<br>Stephen Smith<br>Marvin Fitzgerald | $155,000 | May 8, 2020 |
| New Beginnings Family Services LLC | Stephen Smith / Marvin Fitzgerald | Marvin Fitzgerald<br>Thomas Smith<br>Stephen Smith | $230,000 (not funded) | May 24, 2020 |

After applying for a loan for CFA, the Defendant, Thomas Smith, and Deon Petty agreed to get a fraudulent loan for Petty's company, Rebels. The Defendant, with help from Thomas Smith, created a fraudulent loan application package for Rebels seeking a $155,000 loan. Petty submitted it to Financial Institution 1, and the loan was funded. After the loan was funded, Petty paid the Defendant $30,000 of the fraudulent loan proceeds.

The Defendant did not stop with the fraudulent CFA and Rebels loans. The Defendant was the registered agent of a second company, New Beginnings, that was also defunct. In order to conceal his involvement with New Beginnings, the Defendant directed Marvin Fitzgerald to file paperwork with the State of Wisconsin establishing Fitzgerald as the registered agent of New Beginnings. The Defendant then created a fraudulent loan application package seeking $230,000 with help from Thomas Smith

4

and directed Fitzgerald to submit it to Financial Institution 1. The application was denied, and the loan was not funded.

While the Defendant was not involved in creating the loan applications for Davis Development Group or Glory Transportation, he was involved in certain aspects of the loans. Samuel Davis worked with Thomas Smith to get a loan for Davis Development Group and gave Thomas Smith a cashier's check for $75,000 after the loan was funded. Davis understood that the money was going to be split with the Defendant, and the Defendant drove to Chicago with Thomas Smith to pick up the check. (Davis Plea Agreement, Dkt. No. 25, ¶¶ 12, 20.) After the bank accounts were frozen, the Defendant called Davis to suggest that Davis should protect Thomas Smith for directing the fraudulent scheme. (*Id.* at ¶ 24.)

As to the Glory Transportation loan, the Defendant approached Robert Hamilton to suggest he get a loan. The Defendant told Hamilton that Thomas Smith could help him with the paperwork to get the PPP loan. (Hamilton Plea Agreement, Dkt. No. 38, ¶ 11.) After the Glory Transportation loan was funded and Hamilton paid a portion of the proceeds to Thomas Smith, Thomas Smith told Hamilton to also pay the Defendant $10,000 for suggesting Hamilton get the loan. (*Id.* at ¶ 17.)

The easy money the Defendant and his co-schemers received raised concerns at Financial Institution 1, the bank handling all of the loan applications in the scheme. A representative from Financial Institution 1 reached out to the Defendant on June 8, 2020. He lied about the payment he made to Thomas Smith. He claimed that the $65,000 he paid to Thomas Smith was for equipment and a trailer. He claimed that he paid himself

5

cashier's checks in order to pay CFA employees in cash, and that CFA had 35 or 36 employees.

After the Defendant was contacted by Financial Institution 1, the Defendant also made false statements to law enforcement officers with the Federal Bureau of Investigation. He told them that he used the loan on payroll, operating expenses, and to buy equipment for CFA and that he learned about the PPP program from Google. He also falsely said that he had not helped Petty fill out the application for Rebels.

In the midst of attempting to fraudulently obtain money through the PPP, the Defendant also submitted seven fraudulent applications to the EIDL program, which was another SBA program authorized by the CARES Act to provide low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters. All of his applications contained false information about the number of employees and gross revenues of these businesses, as detailed below:

| Name of Business Applicant | Approx. Date | Gross Revenue (Jan. 31, 2019 – Jan. 31, 2020) | # Employees (As of Jan. 31, 2020) |
|---|---|---|---|
| Complete Fundamentals | 4/2/2020 | $85,000 | 9 |
| Complete Fundamentals | 6/24/2020 | $150,000 | 10 |
| Lyft / Stephen Smith | 6/24/2020 | $3,599 | 1 |
| Uber / Stephen Smith | 6/24/2020 | $4,000 | 2 |
| New Beginnings | 6/23/2020 | $25,000 | 10 |
| New Beginnings | 6/24/2020 | $35,000 | 10 |
| CFA | 7/3/2020 | $25,000 | 9 |

All of the Defendant's EIDL loan applications were declined.

6

## II. PROCEDURAL BACKGROUND

A more detailed recitation of the procedural history of this case can be found in the Government's Position on Restitution. (Dkt. 87.) To summarize, on October 20, 2020, a grand jury returned an indictment charging the Defendant, Thomas Smith, Davis, Hamilton, and Henley for participating in a bank fraud scheme between April 2020 and July 2020, in violation of Title 18, United States Code, Section 1344, and for engaging in money laundering, in violation of Title 18, United States Code, Section 1957. (Dkt. 1.)

The Defendant pled guilty to Count Two of the Indictment (Bank Fraud, in violation of Title 18, United States Code, Section 1344) pursuant to a written plea agreement on February 23, 2021. (Dkt. 53.) Sentencing is scheduled for June 2, 2021.

## III. SENTENCING GUIDELINES CALCULATIONS

The Final Presentence Investigation Report, filed on July 7, 2021, determined that the total offense level was 22 and that the Defendant's criminal history category was I, which corresponds to an advisory Guidelines range of 41 to 51 months' imprisonment. (PSR ¶¶ 91, 127.) The Probation Officer found that the Defendant was subject to a Base Offense Level of seven under U.S.S.G. § 2B1.1(a)(1). (*Id.* at ¶ 81.) The Defendant then received a 14-level enhancement for a loss exceeding $550,000 but less than $1,500,000 under U.S.S.G. § 2B1.1(b)(1)(H). (*Id.* at ¶ 82.) The Defendant received a two-level enhancement because the offense involved sophisticated means under U.S.S.G. §2B1.1(b)(10)(C). (*Id.* at ¶ 83.) The Defendant also received a two-level enhancement

for his role as an organizer, leader, manager, or supervisor of a scheme involving five or more individuals under U.S.S.G. §3B1.1(c). (*Id.* at ¶ 85.)

The parties and the Probation Office agree that the Defendant is entitled to a two-level reduction for acceptance of responsibility. The Defendant has assisted authorities in the investigation and prosecution of his own misconduct by pleading guilty prior to indictment, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently. Therefore, the United States moves the Court, under Section 3E1.1(b), to grant the Defendant an additional one-level reduction in the offense level for acceptance of responsibility if the Defendant receives the two-level reduction for acceptance of responsibility.

With a Total Offense Level as Level 22, and a Criminal History Category of I, the Sentencing Guidelines recommend a sentence between 41- and 51-months' imprisonment.

## IV. CONSIDERATION OF FACTORS UNDER SECTION 3553(A)

### A. Nature and Circumstances of the Offense

As the government, nonprofits, and businesses worked to try and help small businesses suffering from the effects of the unprecedented COVID-19 pandemic, the Defendant engaged in a cash grab to exploit the programs. While the offense period was short, spanning only three months from April to June 2020, it was extensive. The Defendant was involved in the submission of over ten fraudulent applications to the PPP and EIDL programs. This was not a one-time error in judgment, but rather a

8

calculated attempt to take advantage of the relief systems set up for businesses that needed a lifeline because of the pandemic.

Further, the Defendant was involved an organizer of the scheme along with his brother, Thomas Smith. This is evidenced by the fact that the Defendant recruited people to the scheme, including Petty, Fitzgerald, and Hamilton, and put together some of the fraudulent loan paperwork. While his co-schemers have fully admitted that they willingly went along with the Defendant's scheme, it should not be overlooked that the Defendant recruited people that looked to him as a mentor, like Marvin Fitzgerald, someone who he had coached in basketball since Fitzgerald's youth. Most of his co-schemers had not heard of the PPP before the Defendant or his brother approached them.

Finally, the offense was not limited to obtaining funds fraudulently. It also involved significant efforts towards concealing the true nature of the offense. When the bank started to inquire about the loans, the Defendant lied to bank representatives and then FBI agents. When offered a chance to change course and come clean to either the bank or agents, the Defendant instead chose to press forward with his scheme.

    **B.**    **History and Characteristics of the Defendant**

The Defendant is a 42-year-old man with certain health conditions. (PSR ¶¶ 101, 112.) He grew up in a stable family and has close relationships with an extended family. (*Id.* ¶¶ 102-108.) The Defendant married his wife in 2015, but they separated in 2020. (*Id.* ¶ 109.) The Defendant currently resides with his mother. (*Id.* ¶ 111.) The Defendant is the stepfather to his wife's two adult children. (*Id.* ¶ 109.) The Defendant

9

graduated with a Master of Business Administration in 2005. (*Id.* ¶ 118.) He has been employed as a substitute special education teacher since 2006 and also works as a basketball coach. (*Id.* ¶ 120.) He operates a non-profit, Complete Fundamentals, that organizes basketball games and clinics in the Milwaukee area. (*Id.* ¶ 121.)

The Defendant appears to have committed this offense due to a desire to provide for his family, as he was unemployed as a result of the pandemic. *See e.g. United States v. Eggleston*, 347 F.Supp.3d 381, 384 (E.D. Wisc. 2018) (in bank fraud case, noting as a mitigating factor that embezzlement offense was committed to support business rather than for personal enrichment).

      **C.    Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct**

The government believes a serious sentence in this case is necessary for both specific and general deterrence.

The Defendant's actions in this case show that this was not a one-time mistake. The sentence in this case should reflect that the Defendant repeatedly engaged in criminal conduct. The Defendant was involved in the submission of five different fraudulent PPP applications and personally submitted seven different fraudulent EIDL applications. Unlike many of his co-schemers, he did not simply submit one fraudulent loan application.

With respect to general deterrence, there is a strong need to send a message about the significance of this type of offense. *See United States v. Goss*, 325 F.Supp.3d 932, 935 (E.D. Wisc. 2018) (noting "general deterrence may be more of a factor in white collar cases, where at least some of the people tempted to commit such crimes are

10

rationale actors who would be dissuaded by the prospect of prison"). Especially in a case involving PPP fraud, it is important to put any would-be offenders on notice that these offenses do not go unpunished. Actors like the Defendant who seek to defraud this program make it more difficult for administrators of the program to get aid to individuals that qualify for and need it. The Defendant's sentence should serve as a warning and deterrent to others inclined to exploit pandemic relief programs.

> **D.   Consideration of the Types of Sentences Available and to Reflect Policy Statements**

In testimony on April 20, 2021 by Hannibal "Mike" Ware, the Inspector General of the U.S. Small Business Administration, he stated, "[t]here is no higher priority for our office than providing oversight of SBA and the taxpayer's funds at risk through the Coronavirus Aid, Relief, and Economic Security (CARES) Act ensuing legislation and related pandemic response laws aimed at mitigating the pandemic." *See* Statement for the Record, April 20, 2021, U.S. House Committee on Small Business Administration, *available at* https://www.sba.gov/sites/default/files/2021-04/Statement%20for%20the%20Record%204.20.21%20-%20508.pdf. In his written statement, Inspector General Ware described the fraud-prevention initiatives which were designed to protect program funds from opportunistic criminals. He noted that the PPP funding put "strain" on the SBA's operations and revealed some of the "systemic weaknesses" in the SBA's programs. *Id.* at 4.

The federal government should be able to provide emergency funds like PPP loans to the deserving public without having to feel constrained by possible fraudsters who seek to profit from the national disaster. It is important to impose a significant

11

sentence on someone who did not just misrepresent himself in a loan program in the wake of a national disaster, but who acted brazenly, getting loan after loan, and recruiting others into his fraudulent scheme.

  **E.**  **Need for the Sentence to Avoid Unwarranted Sentencing Disparities**

There are two relevant points of comparison to avoid unwarranted sentencing disparities: sentences associated with others convicted of PPP related fraud, and those in this case. Around the country, courts have imposed meaningful jail sentences in PPP fraud cases. *See, e.g.*, *United States v. David Hines*, 21-CR-20011, S.D.FL. (imposing 78-month sentence on an individual who fraudulently applied for multiple PPP loans with a loss of $3.9 million and also assisted others in submitting fraudulent PPP loans); *United States v. Ganell Tubbs*, 20-CR-193, E.D.AR (imposing 41-month sentence on an individual who fraudulently applied for two PPP loans with a loss of $1.9 million); *United States v. Tarik Jaafar*, 20-CR-185, E.D.V.A. (imposing 12-month sentence on an individual who fraudulently applied for 18 PPP loans with a loss of $1.4 million); *United States v. Zhang*, 20-CR-169, W.D.W.A. (imposing 60 day sentence on an individual who fraudulently applied for multiple COVID-19 relief program loans, including four PPP loans with a loss of over $900,000).

While the other cases around the country provide some point of reference for the appropriate sentence, the more relevant comparison is with the other defendants charged as part of this scheme. When comparing the Defendant to others in the scheme, the government submits that the Defendant is one of the most culpable, second

only to his brother, Thomas Smith.[1]  This should be reflected in his sentence.  The Defendant, along with Thomas Smith, recruited others into the scheme, in some cases created the fraudulent loan paperwork, and received money from the fraudulent loan proceeds.  Furthermore, the facts suggest that the Defendant was equally involved in the creation of the scheme, as he approached Thomas Smith in order to get a fraudulent loan for CFA.

V.      **RESTITUTION & FORFEITURE**

The government incorporates its Position on Restitution for Sentencing, filed on April 13, 2021 at Docket No. 87.  For the reasons explained in that submission, the Defendant should be ordered to pay $730,000 in restitution, based on the four funded PPP loans that he was involved in obtaining.

The government is not seeking a separate forfeiture judgment against the Defendant.

*          *          *

For the reasons stated above, the United States respectfully requests that the Court impose a term of imprisonment at the low end of the guidelines, two years of supervised release, and order the Defendant to pay $730,000 in restitution.  The United States submits that this sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

---

[1] This Court sentenced Thomas Smith to 57 months' confinement on June 2, 2021.

Respectfully Submitted,

JOSEPH BEEMSTERBOER
Acting Chief, Fraud Section
U.S. Department of Justice

*/s Laura Connelly*_____
LAURA CONNELLY
LESLIE S. GARTHWAITE
Trial Attorneys
Fraud Section
U.S. Department of Justice
1400 New York Ave. NW
Washington, DC 20005
Phone: 202-307-1423
laura.connelly@usdoj.gov

# **CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will provide copies to counsel for all parties.

*/s Laura Connelly*_____
LAURA CONNELLY
LESLIE S. GARTHWAITE
Trial Attorneys
Fraud Section
U.S. Department of Justice